**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 07-098 (PLF)** |
| | : | |
| **JAMES T. WHITE** | : | |
| | : | |
| **Defendant.** | : | |

---

### SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

    Defendant James T. White, through counsel, respectfully submits the following Supplemental Memorandum in aid of his sentencing.

    On April 15, 2008, James T. White will come before this Court to be sentenced pursuant to his guilty plea to bank embezzlement, in violation of 18 U.S.C. § 656.  At the time Mr. White entered his guilty plea, he was represented by counsel who he had retained.  Mr. White's retained counsel provided some representation in connection with Mr. White's sentencing which included the filing of a sentencing memorandum on Mr. White's behalf.  Before Mr. White could be sentenced, however, Mr. White's retained counsel withdrew from this case and the undersigned was subsequently appointed to represent Mr. White in the instant matter.  Undersigned counsel is filing this supplemental sentencing memorandum in order to present additional relevant facts to the court and to raise further arguments regarding Mr. White's sentencing.

    Based on all the sentencing factors in this case, Mr. White submits that a sentence of time-

served[1] is the appropriate sentence in this matter.  Due to such factors as the circumstances surrounding the offense, Mr. White's background, Mr. White's acceptance of responsibility, the United States Sentencing Guidelines and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a),  a sentence of time-served is the most fair and reasonable sentence which can be imposed.

## DISCUSSION

## I.    THE POST-BOOKER SENTENCING FRAMEWORK.

_____Under Justice Breyer's majority opinion in Booker, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. See 18 U.S.C. § 3553(a)(4)."  United States v. Booker, 125 S.Ct. 738 (2005).  While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in Booker held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Pursuant to Booker, therefore, courts must treat the Guidelines as one, among several, sentencing factor.

_____Pursuant to 18 U.S.C. §§ 3562 and 3553(a) – which were explicitly endorsed by the Supreme Court in Booker – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;

---

[1] Undersigned counsel understands Mr. White was in custody for one day while he was being booked and processed.  If undersigned counsel's assumption is incorrect, Mr. White requests that he be sentenced to one day of incarceration.

and

(D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the Booker majority:

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of Booker, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence. After Booker, courts need not justify sentences outside the guideline range by citing factors that take the case outside the "heartland." Rather, as long as the sentence imposed

is reasonable and supported by the factors outlined in Section 3553, courts may exercise their discretion in individual cases and impose sentences which are not within the proposed guideline range.

More recently, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. See Rita v. United States, 127 S.Ct. 2456 (2007) and Gall v. United States, 128 S.Ct. 586 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. Id.. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. Id.. By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." Rita at 2465. It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court recently reemphasized, '[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.' Gall at 598 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).

As discussed below, after consideration of all relevant sentencing factors, a sentence of time served is a reasonable sentence and time served is the specific sentence which Mr. White requests this court to impose in the instant case.

## II.    A SENTENCE OF TIME SERVED IS REASONABLE AND APPROPRIATE.

### A.    Sentencing Guidelines[2]

### B.    18 U.S.C. § 3553(a) Factors.

1.    <u>Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>

As mentioned in Mr. White's previous sentencing memorandum, the factors that led to Mr. White's involvement in the instant offense stem from issues arising from Mr. White's unfortunate divorce in 2005. Mr. White's approximate ten year marriage formally came to an end in June of 2005. <u>See</u> PSR, ¶ 33. As a consequence of the divorce, Mr. White and his former wife had to make important decisions regarding such issues as how to best provide a healthy and nurturing environment for their two children. The couple agreed to share joint legal and physical custody of the children[3] and they agreed that the children will primarily reside in the single family home in which the family had previously lived. Because Mr. White's financial situation was better than that of his former wife, Mr. White agreed that he would remain in the family home and assume all of the financial obligations associated with the home. Mr. White also made a significant monetary payment to his former wife in order to maintain an exclusive right to the equity the couple had in the home. About two months after his divorce was complete, Mr. White obtained a loan in the amount of $120,000 in order to pay his former wife for her interest in the home.[4] After receiving the loan, Mr. White was successfully able to buy his former wife's interest in the home and he continued to

---

[2]The Sentencing Guidelines have already been discussed in the Sentencing Memorandum filed by Mr. White's previous counsel and, therefore, no further discussion regarding the Sentencing Guidelines is necessary here.

[3]<u>See</u> PSR, ¶33.

[4]This $120,000 loan is the same loan referenced in the Statement of Offense which has been filed with this Court. The loan was obtained on August 10, 2005 from lender Mark Herb.

reside in the family home with his two children.[5]

Aside from issues related to recovering from a divorce, Mr. White and his children lived relatively happy and positive lives in their home until the early part of 2006 when Mr. White began having problems making payments on the loan he obtained from Mr. Herb. Due to Mr. White's inability to make adequate payments on the loan, an attorney for Mr. Herb notified Mr. White on about March 29, 2006 that he "was in default on the note and that foreclosure proceedings would be initiated on White's home if full payment in the amount of $125,800 was not made by April 10, 2006." Statement of Offense at 1. Mr. White was devastated when he received this notice. He was very concerned about losing his home and the potential consequences his family could suffer. His primary concern was for the well being of his children and their need for a good stable home environment.[6] Mr. White immediately sought lawful means for repaying the loan and he concluded that his best option for repaying the loan which was in default was to secure a second more traditional loan with more favorable terms. To this end, Mr. White utilized the services of Loan Officer Charles W. Parker, Jr. to secure this second loan. Mr. White applied for a loan prior to the April 10, 2006 deadline date and he expected to secure the loan in time to pay Mr. Herb's note before the deadline. When April 10 came and Mr. White's loan had not yet been approved, Mr. White became very nervous. According to Loan Officer Charles Parker, "[o]n April 10, 2006 Mr. White was very stressed and concerned because our loan was still processing and was not ready to close." See Exhibit 2. At this point, it became clear to Mr. White that the second loan would not be approved by April 10 and that he

---

[5]Since Mr. White shared custody of his children with his former wife, the children stayed with their mother as well. During this time, Mr. White estimates that his children actually resided with him about eighty percent of the time.

[6]According to friends of Mr. White, Dean and Sharon Chandler, Mr. White's children are 'his world' and "[w]hen he and his wife were proceeding with divorce, the highest priority he expressed to us was his concern for the well being of [his children]." See Exhibit 1.

had no lawful options for repaying Mr. Herb's loan in a timely manner. Therefore, in a foolish act of fear and desperation, Mr. White improperly converted monies from a customer of the bank for which Mr. White worked at the time to himself by withdrawing money from that customer's Certificate of Deposit (CD) account without the customer's consent. Within hours of taking the customer's money, Mr. White used the money to fully repay the defaulted loan.

At the time Mr. White committed this offense he was very reluctant and regretful. Mr. White did not want to improperly take money from anyone but he was desperate and he incorrectly believed that taking the money was his best option at the time.[7] While Mr. White knew what he was doing was wrong, he believed his conduct was mitigated by the fact that he knew he would soon replace the full amount of funds he was taking from the customer. Mr. White reasoned that he would ultimately cause little, if any, harm to the customer from whom he stole because the customer's money would be returned before the customer would likely need his money. Mr. White even placed his own initials on the withdrawal slip which was used to commit the offense so that blame would not be placed on anyone else in the event of detection.

Soon after he committed the offense, Mr. White's misconduct was detected and he was confronted by the bank regarding the incident. Rather than deny his involvement, Mr. White admitted to bank officials that he improperly took money from a customer. Statement of the Offense at 3. Mr. White also informed the bank officials of his intent to repay the converted funds. Id.. When Mr. White's expected second loan finally came through within two weeks of his commission of the instant offense, he did what he always planned and expected to do. Mr. White fully repaid the bank customer in only about two weeks

---

[7]Mr. White previously informed this Court through a letter he wrote several months ago that his "intentions were not to harm or deprive anyone" and he discusses how "panic and fear" can have an impact on ones conduct.

after taking his money. <u>See</u> PSR, ¶ 13. Pursuant to a settlement agreement undersigned counsel understands Mr. White had with Mercantile Bank, Mr. White also paid all costs and expenses, including legal fees, incurred by the bank in connection with Mr. White's misconduct. It was not until after Mr. White made full restitution to the victim and settled with the bank that the instant prosecution ensued against him. Shortly after the instant prosecution began, Mr. White continued to demonstrate his acceptance of responsibility by entering a timely guilty plea with regard to this matter.

Regarding the history and characteristics of Mr. White, with the exception of his poor judgment on April 10, 2006, Mr. White has lead a very productive, respectable and law abiding life. Mr. White was born and raised in Nashville, Tennessee. PSR, ¶¶ 29 & 30. He initially lived with both of his parents until their divorce. PSR, ¶ 30. After his parents' divorce, Mr. White resided with his father and his paternal grandparents. <u>Id.</u>. Due to mental health problems, Mr. White's father was unable to care for Mr. White or for himself without the assistance of Mr. White's grandparents. <u>Id.</u>. While Mr. White was in high school, his father's mental health condition worsened and, due to his father's worsening condition, Mr. White moved from Tennessee to Virginia to reside with his mother and stepfather. <u>Id.</u>. Despite the instability in Mr. White's life caused by his sudden relocation, Mr. White successfully adjusted and he did well in Virginia. While living with his mother and stepfather in Virginia, Mr. White was active with school, athletics and with working part-time jobs. Mr. White "worked at K-mart, washed cars, cut grass and other odd jobs" while staying with his mother. <u>See</u> Exhibit 3. Mr. White also ran track for his highschool in Virginia and his parents are proud of the fact that he set a school record in the 200 meter dash. <u>Id.</u> Mr. White was able to graduate from high school in 1986 and he enrolled at Howard University the following Fall to commence his college education. PSR, ¶ 44.

While at Howard University, Mr. White majored in the Administration of Justice and he minored

in Sociology.  PSR, ¶ 44.  Mr. White remained quite busy during his college years.  He worked at a Marriott hotel to assist with his college related expenses.  See Exhibit 3.  He also completed a six month course which prepared him for the "Series 6/Limited Securities" exam PSR, ¶ 43.[8]  After taking the course work for the Series 6 Exam and prior to taking the exam, Mr. White  successfully earned his Bachelors of Arts (BA) degree from Howard University in 1991.  PSR, ¶ 44.

After graduation, with an interest and background in investments and financial matters, Mr. White began a career in the area of securities and lending.  Less than one year after earning his B.A., Mr. White took the Series 6 exam.  This exam, which involves both the New York Stock Exchange (NYSE) and the National Association of Securities Dealers (NASD), was passed by Mr. White.  PSR, ¶ 43.  As a result of his success, Mr. White earned a "Series 6" license and was able to be involved with certain types of investment activities.  Id..  Later, Mr. White took additional securities courses in order to prepare for the "Series 7/General Securities" exam.  Id..  Mr. White took the Series 7 exam and passed, thereby allowing him to participate in a wider range of securities transactions.  Id..

Between at least 1996 and the present, Mr. White has been consistently employed primarily with financial institutions in the Washington, D.C. area.  PSR, ¶¶ 45-51.  Mr. White has held such positions as an investment officer with First National Bank of Maryland (1996-1998); a financial executive with Citibank, NA (1999-2000); Director of Finance with the Council for Professional Recognition (2000-2002); and a small business client manager with Bank of America (2002-2005).  PSR, ¶¶ 48-51.  Mr. White progressed from one job to another in order to create a better life for himself and his family by

---

[8]The PSR incorrectly states that Mr. White took course work for the "Series 7 Exam" while he was in college and that he took course work for the "Series 6 Exam" after college.  In fact, the reverse is actually true.  Mr. White dealt with the Series 6 Exam first and then he tackled the Series 7 Exam.

improving his experience and increasing his earnings. Significantly, with the exception of the employer related to the instant offense, Mr. White was never terminated from a job due to any misconduct or due to poor performance. Mr. White took pride in his work and he did his work very well. A former co-worker of Mr. White describes his job performance as follows:

> James has served as the role model for a third of managers within our regional Bank of America family. Even today he is called upon to give perspective regarding service and sales. James has exemplified professionalism and courtesy in almost every way and so this letter serves to inform the court of the opinions of his peers.

Exhibit 4.

In 1993, only about two years after graduating from college, Mr. White married Gail Swann. PSR, ¶ 33. Mr. White and Ms. Swann resided in Prince George's County, Maryland and they have two children together. Their first child, James, was born in 1990. Their second child, Kristen, was born in 1993. Mr. White's dedication and devotion towards his children over the years is evident from the several letters which have been written on his behalf. Mr. White's mother and stepfather discuss his active involvement in coaching his daughter's basketball team and the preparations Mr. White's son has been recently making in an effort to attend college in the near future. See Exhibit 3. Long time friends, Dean and Sharon Chandler, describe Mr. White's parenting commitment as follows:

> Also, throughout the years, we have had the pleasure of witnessing Tauri's[9] active role in, and devotion to, his children's (Tyler and Kristen) lives. He has been an outstanding example of a good father and role model. The enormous amount of time he spends with his children allows him to be completely involved with their personal, academic, and athletic development. He has been coaching their sporting activities, such as football and basketball, from very early ages. His commitment to this role has positively affected the other children he has contact with as well.

Exhibit 1. Mr. Whites's close friend, Carl D. Vincent, offers the following regarding Mr. White's role as

---

[9]Mr. White's middle name is Tauri and he is often referred by his middle name by family and friends.

a father:

> I attest that James Tauri White is a good person and an excellent father. James plays a very important role in the lives of his children, Kristin and Tyler. He is very active with them in their sporting activities, academic and personal lives. He is such a needed positive role model to them and the other children that he coaches. I envy him in his commitment to them and use him as an example in the way that I interact with my children.

Exhibit 5.

Over the years, Mr. White's love, care and generosity has also extended to other family members and to members in the community. Mr. White's mother and stepfather describe the devotion and love Mr. White showed towards his sister while she attended graduate school and they are particularly impressed with his ability to provide such support to his sister during a time when he "had to deal with his own travails." Exhibit 3. Mr. White's mother and stepfather also describe the assistance Mr. White provides to his mentally ill biological father and to his aging ill grandfather. Id.. One way in which Mr. White has proudly benefitted other non family members in the community is through his coaching. As letters in support of Mr. White indicate, Mr. White has been coaching youth football and basketball for the past several years. It is his role as a basketball coach which has made him most proud. Mr. White has coached both boys and girls basketball teams through the Upper Marlboro Boys & Girls Club and he has coached local girls basketball teams through the Amateur Athletic Union (AAU). Mr. White estimates that he currently spends three to five days per week fulfilling his duties as a coach. Mr. White is very proud of this service he provides to the community and he believes he has made a positive impact on the lives of many people. Some teams coached by Mr. White have achieved great success. For instance, one team he coached earned a national ranking of 16th and several of the teams he has coached have traveled to places such as Florida, Ohio, Pennsylvania and Virginia because they earned the right to play in regional or national tournaments.

Sadly, between about 2002 to 2005, Mr. White suffered serious marital problems and his world was shattered. Mr. White was depressed during this time and he and his wife sought counseling to resolve their marital issues. PSR, ¶ 39. Their counseling involved joint and individual sessions and lasted about three weeks. Id.. Because Mr. White and his wife were unable to resolve their marital issues, they separated in 2002 and formally divorced in 2005. PSR, ¶ 33. While Mr. White was concerned for the well being of himself and his former wife, his primary concern was the well being of his children. See Exhibit 1. It was during this emotionally fragile time that Mr. White obtained a loan from Mark Herb in order to compensate his former wife for interest in the family home. About a year later, while still trying to rebound from his divorce, Mr. White made the biggest mistake in his life when he committed the instant offense in a desperate effort to repay Mr. Herb's loan before foreclosure proceedings were initiated with respect to his family home. When Mr. White made this huge mistake, he had never previously been convicted for a crime and he had never even had any prior contacts with the criminal justice system. See PSR, ¶¶ 26-28.

Since the offense, as Mr. White always planned to do, he immediately returned the money he improperly took from the bank customer. Mr. White also admitted the full nature of his misconduct when confronted by the bank and he entered into a settlement agreement with the bank. When Mr. White was later prosecuted for his conduct, he continued accepting responsibility and entered into a timely guilty plea. Since his case has been pending, Mr. White has been in compliance with his release conditions[10] and he has been working as a loan officer with Premier 1 Mortgage.[11] In the summer of 2007, Mr. White's employer awarded him the position of "team leader." PSR, ¶ 46.

---

[10]See PSR, ¶ 4.

[11]See PSR, ¶ 46.

Mr. White has also continued to play a very significant role in the lives of his children. Mr. White continues to coach his daughter's basketball team and he continues to assist both children with their educational attainments. Over the past several months, Mr. White's son has been planning and preparing for college. Mr. White's son will be graduating from high school in May of this year and he was recently offered a partial scholarship to attend St. John's University in the state of New York. Mr. White's son has agreed to accept the scholarship and he plans to attend St. John's University in the Fall of this year.

2.    Factors Pursuant to 18 U.S.C. § 3553(a)(2)

As with most offenses, the improper conversion of money by a bank employee from the account of a bank customer for the bank employee's personal use is serious misconduct. Such misconduct, however, is not nearly as egregious as conduct involving violence, dangerous threats, weapons or serious drug related activity. Moreover, in this particular case, the seriousness of Mr. White's nonviolent offense is significantly mitigated by the fact that he only intended to temporarily deprive the bank customer from his money and by the fact that Mr. White fully repaid the bank customer in only about two weeks after committing the offense. Mr. White's cooperativeness with the investigation surrounding his misconduct and his consistent acceptance of responsibility further lessen the seriousness of his offense. Due to these factors regarding the seriousness of this offense as well as Mr. White's history and characteristics (e.g. his lack of any prior criminal history, his family responsibilities and his employment history), a sentence involving no further incarceration is a sentence which will adequately promote respect for the law and such a sentence will provide just punishment for the offense.[12]

Due to the unique facts of this case, a sentence involving no further incarceration will provide ample deterrence for Mr. White and anyone else who may consider committing a similar crime. See 18

---

[12] See 18 U.S.C. § 3553(a)(2)(A).

U.S.C. § 3553(a)(2)(B).  For Mr. White or any other similarly situated person, the hassles and consequences of being prosecuted and obtaining a felony conviction is a huge deterrence.  Also, the obligations, restrictions and limitations on ones freedom due to being placed on supervision is substantially punitive and will have a profound deterrent effect.[13]

Everything about Mr. White's conduct before and after the offense, as well as the unusual circumstances surrounding the offense, indicate that no additional period of incarceration is necessary in order to protect the public from any further crimes by Mr. White.  See 18 U.S.C. § 3553(a)(2)(C).  Mr. White has never committed a crime before the instant offense and he has not committed any crimes since the instant offense.  Both before and after the offense, Mr. White has been a law abiding, hard working, family oriented and community minded citizen.  Mr. White's involvement in this offense was extremely aberrational and only occurred because he found himself in an unusual bind.  Even then, Mr. White was unwilling to involve himself in an offense which would permanently deprive anyone from their money or property.  Rather, Mr. White committed an offense in which he intended to return (and, indeed, did return) the victim's money prior to causing any noticeable harm to anyone.  Under these circumstances, there is absolutely no need to incarcerate Mr. White for any purpose related to protecting the community.

Further incarcerating Mr. White will not assist him with any educational, vocational, medical or

---

[13]In Gall v. United States, the Supreme Court emphasized that non-custodial sentences which involve only supervision are "nonetheless subject to several standard conditions that substantially restrict [a defendant's] liberty." 128 S.Ct. at 595.  The Gall Court further notes that '[p]robation is not granted out of a spirit of leniency' and that 'probation is not merely "letting an offender off easily"' (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)).  Id..  The Court continues by noting the following: '[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives .... They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a case worker or psychotherapist' (quoting 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999).  Id..

other correctional training, treatment or care.  See 18 U.S.C. § 3553(a)(2)(D).  Mr. White has already

obtained a B.A. degree and he has a lengthy and well respected employment history.  Mr. White is

currently employed in a good position and he is doing well at his current job.  In fact, incarceration will

only cause a substantial disruption and setback with respect to Mr. White's employment and educational

situation.

      3.      The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))

Because there is no statutory mandatory minium sentence required in this case and because a

sentence within the Sentencing Guidelines is clearly not mandatory, a sentence of time served is a

sentencing option which is available to this Court.  In order to further punish Mr. White and to provide

some assistance to the community, the Court may also order Mr. White to perform a substantial amount

of community service while on supervision.

      4.      The Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))

Considering the unique circumstances that caused Mr. White to commit the offense, the mitigating

nature of the offense and Mr. White's background, a sentence within the Sentencing Guidelines range will

result in an unwarranted sentencing disparity.  Unlike the instant case, nearly all defendants prosecuted

for the offense at issue here are unable to credibly demonstrate that they ever had any intention on

returning the proceeds of their crime.  Mr. White has repeatedly indicated that he intended to repay the

stolen money and his actions just prior to the offense and after the offense support his contention.  As

discussed above, Mr. White had applied for a second loan as a means to pay off Mr. Herb's loan.  Mr.

White expected the money from the second loan to come through.  When it did not come through in time,

Mr. White committed the offense expecting to be able to replace the money shortly thereafter when the

second loan was finally approved.  Therefore, unlike most other defendants convicted of this type of

offense, Mr. White knew he would have the ability to repay his victim in the near future. Additionally, in an act rarely seen in such cases, Mr. White does in fact fully repay the victim and he compensated the bank for any additional costs it incurred relating to his conduct.

In a typical case involving this type of fraud, the defendant's theft is related to some degree of greed and the theft is often continuous and repeated. In the instant case, Mr. White's misconduct was a one time event which took place during a single day. Mr. White did not use the proceeds to make any lavish purchases. He used the money to repay a defaulted loan in order to avoid foreclosure on the home where he and his children resided. For these reasons, due to the unique factors in this case, a Guidelines sentence will unfairly lump Mr. White's case with other cases in which the conduct is almost always far more egregious than in Mr. White's case. Therefore, a sentence which does not involve any further incarceration is a sentence consistent with promoting the goal of avoiding unwarranted sentencing disparities.

**D.    Conclusion**.

For the reasons discussed above, a sentence of time served followed by a period of supervised release is the most reasonable and appropriate sentence in this case. Such a sentence will adequately punish Mr. White as well as afford him an opportunity to remain in the community and live the hard working and respectable life he typically lives. Such a sentence, especially if coupled with a community service obligation, will also benefit the community because Mr. White can continue assisting and coaching youth and he can use any other talented skills he possesses in helping the community through various community service activities. Mr. White's family will also best be served by a time served sentence. Mr. White can continue raising his daughter as she has been raised for the past several years and Mr. White can provide much needed financial assistance to his son who will begin attending college later this year.

Also, if Mr. White can remain in the community, he will be able to continue his generous financial assistance to his mentally ill father and his medically ill grandfather .  For these reasons, as well as any other reasons this Court may consider, Mr. White respectfully requests that the court impose a sentence of time served to be followed by a period of supervised release.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
TONY W. MILES
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Washington, D.C.  20004
(202) 208-7500

**EXHIBIT 1**

James Tauri White

July 30, 2007

Judge Paul Friedman
U.S. District Court
Washington, DC

Dear Judge Friedman:

Our names are Dean and Sharon Chandler and we are writing this letter in support of our
dear and long time friend, James Tauri White. We are hoping that this letter conveys our
sentiments that he is a sincere and caring person who has made a difference in our lives
and that this will be considered in his upcoming sentencing.

The two of us are both originally from Boston and have known each other since high
school . Dean currently has his own real estate appraisal business, and previously spent
many years as a semi-conductor sales engineer and manager for the same San Diego
based company. Sharon is a Vice President of a Community Action Agency and
currently runs the Head Start education program in Boston Massachusetts. She is an
attorney by profession and previously served as a Massachusetts Assistant Attorney
General before going into the non-profit sector. We have three children and are very
active within the larger community.

Dean and Tauri met when they were sophomores at Howard University in Washington
DC almost 20 years ago. Tauri was one of the first people Dean met when he transferred
colleges and moved to Washington from Boston. Tauri helped him get acclimated to the
city as well as helped Dean get his first job at the hotel where he was working. Over the
years and the geography, Dean and Tauri have remained good friends and in close
contact. Tauri has been the kind of person that Dean relied on for career, relationship,
and family advice.

This close relationship naturally extended to Sharon after the two of us reunited in 1998.
In 2000, when we decided to get married, it was instinctive to have Tauri be an integral
part of our wedding. He flew up from Washington DC and stayed for several days to
share in our very important day. Each year, whenever our family travels to Washington
on business or pleasure, Tauri always opens his house and welcomes us as part of his
family. We are grateful for his generosity and his support.

James Tauri White

Also, throughout the years, we have had the pleasure of witnessing Tauri's active role in, and devotion to, his children's (Tyler and Kristin) lives. He has been an outstanding example of a good father and role model. The enormous amount of time he spends with his children allows him to be completely involved with their personal, academic, and athletic development. He has been coaching their sporting activities, such as football and basketball, from very early ages. His commitment to this role has positively affected the other children he has contact with as well. When he and his wife were proceeding with divorce, the highest priority he expressed to us was his concern for the well being of Tyler and Kristin. We never doubted that he would share custody and continue to raise them to be the outstanding young people that they are. They are "his world" and we are saddened that that they, too, may be seriously impacted by this current situation.

We understand that Tauri has taken full responsibility for his actions and, in fact, would expect no less from him. It is an action that we believe is totally out of character for the person we have known, and is one that he truly regrets. We know that he continues to have so much to offer his family, friends and the community. We ask that you take into account his history as a friend and father, and allow this to positively impact his sentencing.

Thank you in advance for considering our experience and relationship with him as part of this proceeding.

Respectfully,

Dean and Sharon Chandler
16 Harwood Road
Natick, MA 01760
508-315-3179

**EXHIBIT 2**

To whom it may concern:                 April 02, 2008

Ref: James White's Mortgage Loan

---

Prior to April 10, 2006, I was a Loan Officer for a Lender and I was working on a mortgage for James White to refinance him out of his current Hard Money loan. On April 10, 2006 Mr. White was very stressed and concerned because our loan was still in processing and was not ready to close. If I can be of any other assistance, please feel free to call me at 240-353-0274.

Sincerely,

Charles W. Parker Jr.

**EXHIBIT 3**

Richard G. Stewart, Jr.
Sandra J. Stewart
2327 Southern Oak Drive
Irving, Texas 75063
July 31, 2007
972-831-1237

The Honorable Paul L. Friedman
U. S. District Court for the District of Columbia
E. Barrett Prettyman US Court House
Room 6012
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Subject: James Tauri White; Docket NO: CR-07-098-01

Dear Judge Friedman:

We are writing in support of our son James "Tauri" White who is scheduled to appear before you for sentencing, and to request imposition of a sentence which does not include imprisonment. We fully appreciate the seriousness of the offense in this case, but also believe that a felony conviction, loss of a promising career, restitution prior to initiation of criminal proceedings, significant legal expenses, his good standing within the community as well as other mitigating factors justify a downward sentencing departure.

Tauri is the father of two children, James "Tyler" White, 16 and Kristen White 14. Tyler will be a high school senior and recently completed a summer college preparatory course at Virginia Commonwealth University. Tyler hopes to attend NYU or VCU. Tauri has coached Kristen's basketball team since 2001. He is also a devoted and loving brother, and even though he has had to deal with his own travails during the past year and a half, he has been of great assistance and support to his younger sister while she attended graduate school. He also assists with supporting his biological father, James White, Jr. and his grandfather, James White, Sr. His father, a diagnosed paranoid schizophrenic, has not worked in more than 25 years and lives with Tauri' grandfather, who is in his mid-eighties, a diabetic and in ill health. Their income consists of James White, Sr.'s social security check and

monthly contributions from Tauri. To the best of our knowledge his dad does not have any source of income or disability benefits. If something were to happen to his grandfather, Tauri would be responsible to taking care of his Dad.

When we married in 1981, Tauri remained with his father so he would not disrupt his education and lived with his father and grand parents. When we learned of his father's condition he was required to move to Springfield, VA to live with us. He graduated from Robert E. Lee High School where he set a school record in the 200 meter dash. He has always been a hard worker and during high school he worked at K-mart, washed cars, cut grass and other odd jobs. While attending Howard University he worked at the Marriott Hotel, Crystal City to help defray tuition and other expenses. Since leaving Howard he has had a number of positions of increasing responsibility.

We are confident that Tauri has learned from his mistake. Moreover, he did not profit from the money he took, he has made restitution and has started life anew. The matter which brings him to the court is completely out of a character. We have never had any problems with Tauri with regard to dishonesty, any form of substance abuse, or any other misconduct. We also believe that a sentence which will allow him to continue his current employment and support his family will best serve all.

Thank you very much for considering this request.


Sincerely,



Sandra and Richard Stewart

# EXHIBIT 4

October 5, 2007

$Ol 07-98$

Arnold J. Points Jr.
Campus Way
Largo Maryland

Honorable Judge Paul Freidman                          Re: James T. White
United States District Court
333 Constitution Ave NW
Room #6012
Washington DC 20001

Dear Judge Freidman:

This letter serves as support for James T. White who will be coming before you for
sentencing in the next weeks. I have known James for the better part of 11 years at this
point. We meet while employed with National Bank and have remained close as we
moved into new roles with other banks. Most recently we worked together at Bank of
America where I am currently employed as a Vice President. I am also currently a Staff
Sergeant with the United States Air Force where I served abroad in the Middle East (Gulf
War & Dessert Storm).

Everything I know about James has been positive up until this incident. James has served
as the role model for a third of the managers within our regional Bank of America family.
Even today he is called upon to give perspective regarding service and sales. James has
exemplified professionalism and courtesy in almost every way and so this letter serves to
inform the court of the opinions of his peers.

The unique perspective James has imprinted on the teams left behind him is that family
comes first. Productivity comes from a happy employee and a happy family life. Often
James would leave a meeting in favor of attending an event for his children. Most often
he was in the gym or on the field. His home was often the haven for girls and boys to stay
while parents went away. I do realize that James's offense is the matter at hand but
wanted to be certain to offer a picture outside of the offense itself. Truthfully, James was
one of my primary supporters when my son passed away last year.

James has accepted his decision to act improperly. He has done an excellent job
rebuilding his life from that point. Please allow him the opportunity to continue the job of
parenting and leading by example. I am certain that this experience has made him a better
person and a better father. With a son graduating in May and a daughter now in the ninth
grade, these are important times in their lives.

Sincerely,

Arnold J. Points Jr.

# EXHIBIT 5

# CARL D. VINCENT

898 Oak Street SW, #1316 • Atlanta, Georgia 30310 • (404) 387-4513 • carl.vincent.l99e@statefarm.com

July 24, 2007

Judge Paul Friedman
US District Court
Washington DC

RE:  Letter of Support to the Judge for James Tauri White

Dear Judge Friedman,

I am writing to you on behalf of my close friend, James Tauri White, who will have his sentencing before you in August.  I have known James for twenty-four years.  We met during our high school years and our relationship has continued to this day.  I am employed as a Catastrophe Claims Adjuster with State Farm Insurance and am a 1st Lieutenant in the Georgia Army National Guard.

I attest that James Tauri White is a good person and an excellent father.  James plays a very important role in the lives of his children, Kristin and Tyler.  He is very active with them in their sporting activities, academic and personal lives.  He is such a needed positive role model to them and the other children that he coaches.  I envy him in his commitment to them and use him as an example in the way that I interact with my children.

As a friend, I have come to count on James' advice and support.  When I recently served in Baghdad, Iraq as a convoy leader for the Army, I could always count on his calming and reasonable words.  His thoughtfulness and foresight helped me make it through what I considered to be helpless and horrific times.

I am aware that James has accepted responsibility for his actions that has brought him before the Courts.  I would ask that you consider his commitment to his family and the community in which he lives and plays an active role in, and the loss of his presence in his children's lives, to impose a non-internment sentence.  James is no doubt, remorseful for his actions.  I believe that society would best benefit from James continuing to give back to his community in some form of community service.  He has so much to offer and could only be a positive to role model to others about preparing for life's challenges and situations.

Thanks in advance for reading my letter and considering a non-internment sentence for my friend.

Very Respectfully,

Carl D. Vincent